UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:17-CV-00035-TBR

CORIZON HEALTH, INC.,                                                           PLAINTIFF

v.

CORRECTEK, INC., *et. al*,                                                 DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants CorrecTek, Inc., Burton Ulrich, Dan Jarrett, and Matt Wurth's (collectively, "Defendants") Motion to Dismiss Counts I, II, and II of Plaintiff Corizon Health, Inc.'s complaint as to all Defendants and to dismiss Count IV as to Defendants Ulrich, Jarrett, and Wurth. [DN 32.] Plaintiff responded, [DN 35], and Defendants replied, [DN 41.] For the reasons stated herein, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

BACKGROUND

Plaintiff Corizon Health, Inc. ("Corizon") is a healthcare provider for correctional facilities in the United States. Defendant CorrecTek, Inc. ("CorrecTek") licenses electronic medical record software to correctional healthcare providers. On January 16, 2013, Corizon and CorrecTek entered into a Master Software License and Support Services Agreement ("MSA"), pursuant to which Corizon planned to license software from CorrecTek. [DN 1 at 4.] CorrecTek offered two types of medical software products, "CorrecTek EMR" and "CorrecTek eMAR." [*Id.*][1] Later in 2013, in response to a request for proposal from the Idaho Department of Corrections ("IDOC"), Corizon sought to implement an Electronic Medical Records ("EMR") system and an Electronic Medication Administration Records ("eMAR") system. [*Id.*] As part of

---

[1] The MSA was amended in July 2013 and March 2015. [DN 1 at 4.]

1

its response to the IDOC's request for proposal, Corizon included information it received from CorrecTek about its EMR and eMAR software. [*Id.* at 5.] Specifically, Corizon relied on information included in a document provided by CorrecTek titled EMR Overview: Information for Corizon RFP Response ("EMR Overview"). [*Id.*] In that document, CorrecTek stated that its EMR is customizable, allows for fast and accurate data entry, and allows for automated and electronic medication prescribing. [*Id.* at 5–6.] Corizon attached this document to its September 30, 2013 proposal to the IDOC. [*Id.* at 6.]

On December 4, 2013, IDOC and Corizon met with CorrecTek representatives in Idaho. [*Id.*] Present at this meeting were Defendants Jarret, CorrecTek's president, Ulrich, and Wurth. [*Id.*] At the meeting, Corizon and the IDOC inquired into the configurability, functionality, and productivity of CorrecTek's EMR and eMAR. [*Id.* at 6–7.] Corizon alleges that, in response, the CorrecTek representatives made many statements, including that the software was "robust" and "state of the art," that it was "fully configurable," that it "could generate any reports" that Corizon and the IDOC required, that CorrecTek could create any forms that Corizon needed, that its eMAR could properly manage the administration of patient prescriptions, that the system would increase productivity, and that its "system could automatically make provider referrals based upon patient responses to certain information." [*Id.* at 7.]

According to Corizon, in reliance on these many representations, it executed the Schedule to Master Service Agreement Dated March 4, 2014 (the "IDOC Schedule"). [*Id.* at 8.] Pursuant to the IDOC Schedule, Corizon would license CorrecTek's EMR and eMAR for its contract with the IDOC. [*Id.*] From July 22, 2014 to August 8, 2014, representatives from both companies met in Idaho for Conference Room Pilot meetings. [*Id.*] At the second meeting, Corizon highlighted several requirements for the IDOC system, including "comprehensive, user-friendly reporting

and required field technology." [*Id.*] CorrecTek indicated that it could configure the software to satisfy these requirements. [*Id.* at 9.]

Ultimately, according to Corizon, CorrecTek, Jarret, Ulrich, and Wurth's representations about the features of the software proved to be inaccurate in numerous ways. [*Id.* at 9–14.] For example, Corizon claims that CorrecTek's EMR was not robust or state of the art because it did not include proper "form field technology," "pre-defined dropdown choices in key fields," scanning capabilities, "allow referrals to healthcare providers based upon patient responses," permit a formulary update or store medication doses, and it allowed for inconsistent entries. [*Id.* at 9–11.] Additionally, Corizon states that the software was not fully configurable because it could not be configured so as to auto-populate patients' routine vital information such as height and weight and could not provide all of the necessary reports required by Corizon, IDOC, and the courts. [*Id.* at 11–12.] With regard to patient prescriptions, the eMAR did not effectively manage the administration of medications because it did not properly track prescription schedules and dosing requirements and CorrecTek was unable to integrate successfully with pharmacy vendors. [*Id.* at 12.] Finally, the software did not increase productivity, as its shortcomings required Corizon to resort to paper recordkeeping, healthcare providers spent substantial time completing records, and the software ran much more slowly than it did during CorrecTek's demonstration. [*Id.* at 13.]

On October 27, 2015, Corizon notified CorrecTek, via letter, of the alleged deficiencies of the software. [*Id.* at 14.] CorrecTek responded in a December 9, 2015 letter in which it denied any responsibility for the claimed issues. [*Id.*] In a letter dated February 2, 2016, Corizon's counsel again outlined the alleged misrepresentations and inadequacies regarding CorrecTek's

software and provided written notice that Corizon was terminating the IDOC Schedule. [*Id.*] Corizon further demanded a full refund of the licensing fees it paid to CorrecTek. [*Id.*]

On March 21, 2016, Corizon filed suit against CorrecTek, Ulrich, Jarrett, and Wurth in the District of Idaho claiming fraud, violations of the Idaho Consumer Protection Act, violations of the Tennessee Consumer Protection Act, and breach of contract. [DN 1 at 15–19.] Defendants then filed a Motion for Change of Venue to the Western District of Kentucky, which was granted on February 3, 2017. [DN 9; DN 46.] The case was transferred to this Court on March 10, 2017. [DN 28.]

STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss under Rule 12(b)(6), a party must "plead enough 'factual matter' to raise a 'plausible' inference of wrongdoing." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). When considering a Rule 12(b)(6) motion to dismiss, the court must presume all of the factual allegations in the complaint are true and draw all reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983)). "The court need not, however, accept unwarranted factual inferences." *Id.* (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). Should the well-pleaded facts support no "more than the mere possibility of

misconduct," then dismissal is warranted. *Iqbal*, 556 U.S at 679. The Court may grant a motion to dismiss "only if, after drawing all reasonable inferences from the allegations in the complaint in favor of the plaintiff, the complaint still fails to allege a plausible theory of relief." *Garceau v. City of Flint*, 572 F. App'x. 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 677–79).

To plead a claim sounding in fraud requires a bit more. Civil Rule 9(b) imposes a heightened pleading standard: A complaint must state the facts constituting the fraud with particularity. Fed. R. Civ. P. 9(b); *see Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011). Accordingly, the plaintiff "must generally (1) specify the time, place, and content of the alleged misrepresentation; (2) identify the fraudulent scheme and the fraudulent intent of the defendant; and (3) describe the injury resulting from the fraud." *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 358 (6th Cir. 2014) (citing *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008)). The purposes animating Civil Rule 9(b) are "(1) to alert defendants to the particulars of the allegations against them so they can intelligently respond; (2) to prevent 'fishing expeditions'; (3) to protect defendants' reputations against fraud allegations; and (4) to whittle down potentially wide-ranging discovery to only relevant matters." *Id.* (citing *Chesbrough*, 655 F.3d at 466–67).

DISCUSSION

In the instant motion, Defendants argue that Corizon's claims against them must be dismissed for multiple reasons. First, Defendants contend that Corizon failed to satisfy Rule 9(b)'s heightened pleading standard for fraud, which Defendants argue underlies each of Corizon's claims. [DN 32-1 at 13–16.] Second, Defendants contend that Corizon's claims under the Idaho Consumer Protection Act and Tennessee Consumer Protection Act must be dismissed because of the Kentucky choice of law clause in the MSA. [*Id.* at 16–17.] Third, Defendants

5

argue that the breach of contract claim should be dismissed as to the individual Defendants, Ulrich, Jarrett, and Wurth, as the contract was entered into only by Corizon and CorrecTek. [*Id.* at 5–6.] The Court will address each of these arguments in turn.

1. **Fraud**

First, Defendants argue that all of the clams in Corizon's complaint must be dismissed for failure to satisfy the heightened pleading standard of Rule 9(b). [DN 32-1 at 9–16 (Memorandum in Support of Defendants' Motion to Dismiss).] Though only one of Corizon's four claims is labeled "fraud," Defendants argue that Corizon's other three claims are based on the same alleged misrepresentations and fraudulent conduct, and therefore that they "sound in fraud" and are also subject to Rule 9(b). [*Id.* at 13.]

The Sixth Circuit has recognized that when the claims in a complaint "sound[] in fraud, they must meet Rule 9(b)'s pleading requirements at the outset." *Smith v. Bank of Am. Corp.*, 485 F. App'x 749, 752–53 (6th Cir. 2012) (citing *Hennigan v. Gen. Elec. Co.,* 09–11912, 2010 WL 3905770, at *14 (E.D. Mich. Sept. 29, 2010)). This remains true even when a party "does not place the label of 'fraud' on [all of] its claims, [but] they are nonetheless 'premised on allegations of fraud.'" *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 n.7 (6th Cir. 2012) ("[C]ourts may make a preliminary inquiry into the nature of the plaintiff's allegations ... [to determine whether] the claims are premised on allegations of fraud.... If the underlying claims sound in fraud, Rule 9(b) applies." (internal quotations and citations omitted)).

Here, because Count I of the complaint is a claim for fraud, it is clearly subject to Rule 9(b)'s heightened standard. [*See* DN 1 at 15–16.] Counts II and III of the complaint allege violations of the Idaho Consumer Protection Act (ICPA), Idaho Code § 48-601, *et. seq.*, and the Tennessee Consumer Protection Act (TCPA), Tenn. Code Ann. § 47-18-101, *et. seq.*,

respectively. [*Id.* at 16–18.] Both the ICPA and the TCPA make it an unfair or deceptive trade practice to "[r]epresent[] that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have," and to "[r]epresent[] that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Idaho Code Ann. § 48-603(5); (7); Tenn. Code Ann. § 47-18-104(5); (7).

And indeed, both Idaho and Tennessee District Courts have concluded that claims brought under the ICPA and the TCPA must be pled with particularity under Rule 9(b). *Tuttle v. Treasure Valley Marine, Inc.*, No. 1:15-CV-00314-BLW, 2016 WL 3198230, at *2 (D. Idaho June 8, 2016) (holding that allegations of misleading, false, and deceptive practices in violation of the ICPA had to be "be accompanied by the 'who, what, when, where, and how' of the misconduct charged" as required by Rule 9(b).); *Bridgestone Am.'s, Inc. v. Int'l Bus. Machines Corp.*, 172 F. Supp. 3d 1007, 1019 (M.D. Tenn. 2016) ("TCPA claims are subject to the higher pleading standard articulated in Rule 9(b).") Accordingly, the Court agrees that Corizon's ICPA and TCPA claims, set out in Counts II and III of its complaint, are subject to Rule 9(b)'s heightened pleading standard.

Count IV of the complaint, which alleges breach of contract, [DN 1 at 18–19], presents a somewhat closer call. In part, Corizon alleges that CorrecTek breached the IDOC Schedule by failing to refund Corizon's licensing fees after it terminated the IDOC Schedule in accordance with the contract. [*Id.* at 18.] This allegation does not appear to "sound in fraud." However, Corizon further alleges that, due to CorrecTek's continued misrepresentations about the capabilities of its software, Corizon was deprived of a contractual remedy provided for under the MSA which would have entitled it to recover 90% of the license fee had it cancelled the IDOC Schedule at least 181 days before the "Target Go Live Date." [*Id.*] According to Corizon, "[b]y

7

materially misrepresenting the functionality of the CorrecTek EMR even upon notice of the degree of required customization, CorrecTek deprived Corizon of this contractual remedy." [*Id.*] Therefore, it appears that the latter portions of Corizon's breach of contract claim may sound in fraud.

In any event, because each of Corizon's four claims are based on the same "unified course of fraudulent conduct" regarding the misrepresentations about CorrecTek's software, *see Smith*, 485 F. App'x at 755, and because Corizon plead that conduct with sufficient particularity, the Court finds that the requirements of Rule 9(b) are satisfied with regard to each of the four claims in the complaint. Specifically, Corizon adequately set forth the time, place, and content of the alleged misrepresentations, identified the fraudulent scheme and the fraudulent intent, and described how it was injured as a result. *See SFS Check*, 774 F.3d at 358 (citing *SNAPP*, 532 F.3d at 504). Specifically, Corizon detailed the alleged misrepresentations contained in the EMR Overview document CorrecTek sent it prior to submitting its September 30, 2013 proposal to the IDOC, the alleged misrepresentations made by Ulrich, Jarrett, and Wurth at the March 4, 2014 presentation in Idaho, and the alleged August 12, 2014 misrepresentation made by CorrecTek representatives "that it could configure the software to satisfy" the specific requirements emphasized by Corizon at the IDOC at the August 8, 2014 Conference Room Pilot meeting in Idaho. [DN 1 at 4–9.] Corizon further alleged, in detail, how these representations proved to be false due to the numerous deficiencies in the software and how it was harmed as a result. [*Id.* at 9–15.]

Defendants' only argument as to why Corizon's allegations do not meet the requirements of Rule 9(b) is that they impermissibly "lump together" CorrecTek and the three individual Defendants, Ulrich, Jarrett, and Wurth, and therefore that Corizon failed to plead fraud with

8

particularity as to *each* Defendant. [DN 32-1 at 13–16.] To be sure, "when a complaint involves multiple defendants, 'each defendant's role must be particularized with respect to their alleged involvement in the fraud.'" *GMAC Mortg., LLC v. McKeever*, No. CIV.A. 08-459-JBC, 2010 WL 3470312, at *2 (E.D. Ky. Aug. 31, 2010) (citing *Anderson v. Pine South Cap., LLC,* 177 F.Supp.2d 591, 596–97 (W.D. Ky. 2001)). Contrary to Defendants' argument, the Court finds that Corizon's allegations are sufficiently particularized as to each Defendant.

Corizon alleges in its complaint that a meeting occurred in Idaho on December 4, 2013 during which Jarrett, Wurth, and Ulrich jointly "presented to Corizon and the IDOC the capabilities of CorrecTek's EMR and eMAR." [DN 1 at 6.] Jarrett, CorrecTek's president, attended the meeting in person, while Ulrich and Wurth attended remotely. [*Id.*] Also present were Corizon and IDOC representatives. [*Id.*] Corizon alleges that, at this meeting, "Ulrich, Jarrett, and Wurth represented that CorrecTek could deliver an EMR that was suitable for the IDOC contract and that had the capabilities and configurability to comply with the demands of the IDOC contract, including decrees to which the IDOC was required to abide." [*Id.*]

After IDOC and Corizon representatives specifically asked about the configurability and functionality of the CorrecTek EMR, Corizon alleges that the CorrecTek representatives at the meeting (which it appears were only Ulrich, Jarrett, and Wurth) represented, among other things, that the software was "fully configurable" in that it "could generate any reports required by Corizon, IDOC, and court orders imposed on IDOC," could create any forms Corizon needed, and could automatically make provider referrals. [*Id.* at 7.] Corizon alleges that, as a result, it executed the IDOC Schedule to the MSA. [*Id.* at 8.] And as the Court outlined above, Corizon alleges that all of these statements were untrue. [*Id.* at 9–14.] For instance, the EMR "did not allow referrals to healthcare providers based upon patient responses," nor was it "able to provide

9

the reports, forms, and system features required by Corizon and the IDOC." [*Id.* at 11.] Moreover, Corizon alleged the software was not fully configurable, as CorrecTek was unable to configure it so as "to auto-populate vital information on each form." [*Id.*]

Finally, Corizon adequately pled how the alleged misrepresentations by CorrecTek, Jarrett, Ulrich, and Wurth injured it. Specifically, it claims that the inadequacies of the CorrecTek EMR and the fact that it "ran unreasonably slowly" eventually "left Corizon with no choice but to abandon the EMR entirely and return to paper recordkeeping." [*Id.* at 13.] This led to significant delays and a reduction in the amount of patients healthcare providers could see in a day due to the "substantial additional time" it took healthcare providers to complete the medical records. [*Id.*] Because CorrecTek and the individual defendants allegedly misrepresented the capabilities of the software, Corizon alleges that it lost significant amounts of money it paid to license the software and suffered additional pecuniary harm. [*Id.* at 12–16.]

Based on these facts, the Court finds that Corizon pled, with particularity, the misrepresentations made by Ulrich, Jarrett, and Wurth at the March 4, 2014 meeting so as to plausibly state a claim sounding in fraud. Though, as Defendants point out, Corizon did not specify which individual Defendant made which exact statements at the meeting, Corizon nonetheless provided particularized enough facts to allow the individual Defendants to intelligently respond to its allegations, the key purpose of Rule 9(b). *See Chesbrough*, 655 F.3d at 466 (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 503 (6th Cir. 2007) ("The Rule's purpose is to alert defendants 'as to the particulars of their alleged misconduct' so that they may respond."). *See also Smith*, 485 F. App'x at 753 ("[T]he pleading must at least put the [defendant] on notice as to the time, place, and content of the alleged misrepresentations.")

Defendants are correct that, in some places throughout its complaint, Corizon alleges that CorrecTek, as an entity, made certain representations, though without specifying the company representative who made them. [DN 32-1 at 15–16; *see, e.g.*, DN 1 at 9 ("On August 12, 2014, CorrecTek represented that it could configure the software to satisfy the requirements discussed at the" Conference Room Pilot meeting.)] While this perhaps presents a closer call as to the particularity requirement, because of the abundance of other detail Corizon provided, including the date and content of the representations, viewed in the light most favorable to Corizon, the Court finds that these allegations plausibly state a claim sounding in fraud and are sufficiently specific to put CorrecTek on notice of the claims against it so that it may intelligently respond. *See KSA Enterprises, Inc. v. Branch Banking & Trust Co.*, No. 5:14-CV-00182, 2015 WL 5611655, at *5 (W.D. Ky. Sept. 23, 2015) ("While an exceedingly close question, KSA has plausibly stated a claim for fraud which might entitle it to some relief and has done so with the particularity required.")

In sum, to the extent each of Corizon's four claims sound in fraud, the Court finds that Corizon has adequately set forth, "with particularity[,] the circumstances constituting fraud." Fed. R. Civ. P. 9(b). As a result, Corizon has satisfied the purposes of Rule 9(b) by notifying each of the four named Defendants of the particular allegations against them so that they can intelligently respond and by providing specific facts so as to avoid fishing expeditions, protect Defendants' reputations, and narrow discovery to only relevant matters. *SFS Check*, 774 F.3d at 358 (citing *Chesbrough,* 655 F.3d at 466–67).

   2. **Violations of the Idaho Consumer Protection Act and the Tennessee Consumer Protection Act**

Second, Defendants argue that Counts II and III of the complaint, which allege violations of the ICPA and TCPA, respectively, must be dismissed because the choice of law clause in the

MSA provides that the MSA shall be governed by Kentucky law. [DN 32-1 at 16–17.] Specifically, the MSA contains a provision which provides that the "Master Agreement shall be governed in all respects by the laws of the Commonwealth of Kentucky and not the law of conflicts." [DN 1 at 38 (MSA).] Another provision states that the "Master Agreement, together with all applicable Exhibits, Schedules and Attachments shall constitute the entire agreement between C[orizon] and C[orrecTek]." [*Id.* at 22.] In other words, the IDOC Schedule, executed after the MSA, is also part of the parties' agreement.

Defendants' argument presents for the Court the question of whether Corizon can maintain Idaho and Tennessee statutory claims in the face of a choice of law clause requiring the Court to apply Kentucky law. Ordinarily, this would require a two-part analysis. First, courts typically determine whether the parties' choice of law clause is valid and enforceable. *See Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 360 (6th Cir. 1993) ("[T]he issue . . . involv[es] three separate, sequential questions. First, is this a valid choice of law clause[?];" "Second, if the clause is valid, is this choice of law provision enforceable under Michigan choice of law rules?"); *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 566 (Ky. 2012) ("Because the choice of law is a threshold question in our review and was raised by [defendant] in its cross-petition, we first address the enforceability of the Service Agreement's choice of law provision."). Here, however, Corizon does not dispute the validity or enforceability of the parties' Kentucky choice of law clause. Indeed, Corizon has conceded that it applies to the MSA. [*See* DN 35 at 12 ("Although Kentucky law controls the Master Services Agreement, such a choice of law provision does not address tort claims between the parties.")]

Since the parties do not dispute the validity or enforceability of the Kentucky choice of law clause, "the Court need not engage in a lengthy choice of law analysis." *Spiller v. Travelers Prop. Cas. Co. of Am.*, No. 4:15CV-00051, 2016 WL 5867426, at *2 (W.D. Ky. Oct. 6, 2016)

(McKinley, Chief J.) (citing *Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670, 673 n.2 (6th Cir. 1999) ("We need not inquire into choice-of-law issues; the parties did not dispute that Ohio law applied."); *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) ("All U.S. Courts of Appeals to have addressed the issue have held that choice-of-law issues may be waived."); *Redmond v. ACE Am. Ins. Co.*, 614 F. App'x 77, 79 (3d Cir. 2015) ("As the parties agree that New York law applies, we need not undertake a choice-of-law analysis."); *Buckner v. United States*, No. 4:13-CV-02469, 2015 WL 5023079, at *8 (N.D. Ohio July 1, 2015), *report and recommendation adopted*, No. 4:13-CV-2469, 2015 WL 5023069 (N.D. Ohio Aug. 21, 2015) ("Since the parties agree that Pennsylvania law applies in this case . . . the Court need not engage in a lengthy choice of law analysis.")) Accordingly, the Court will apply Kentucky law as required by the parties' choice of law provision.

The Court now proceeds to the second part of the analysis, which poses the question, "does [Kentucky] law govern *all* claims between the parties or only contract claims?" *Banek*, 6 F.3d at 360 (emphasis added). Unlike the choice of law issue, Corizon heartily disputes this question. Specifically, Corizon argues that its ICPA and TCPA claims "are not covered by [the Kentucky] choice of law provision because the provision does not attempt to reach beyond the four corners of the contract." [DN 35 at 10–14.] The Sixth Circuit addressed this precise issue and a highly analogous fact pattern in *Moses v. Business Card Express, Inc.*, 929 F.2d 1131 (6th Cir. 1991). There, plaintiffs brought suit against the defendants in the Northern District of Alabama "alleg[ing] violations of Alabama statutes establishing causes of action for misrepresentation, deceit and violation of the Alabama Deceptive Trade Practices Act," and "conspiracy to defraud." *Id.* at 1134. Pursuant to a Michigan forum selection clause, however, the Alabama District Court transferred the case to the Eastern District of Michigan. *Id.* at 1134–35. The Michigan District Court then concluded that the Michigan choice of law clause in the parties'

13

agreement was valid, enforceable, and controlling, and thereafter granted summary judgment for the defendants. *Id.* at 1139. On appeal, after affirming the district court's finding that the choice of law clause was valid and enforceable, the court turned to the issue of how broadly the choice of law clause applied to the plaintiffs' claims. *Id.* at 1139–40. Similar to Corizon, the plaintiffs in *Moses* "assert[ed] that the choice of law clause applie[d] only to construction of the contract itself and not to their claims of fraud and misrepresentation." *Id.* at 1139. The court disagreed.

The choice of law clause at issue in *Moses* read "This Franchise and License Agreement and the construction thereof shall be governed by the laws of the state of Michigan...." *Id.* According to the Court, because the provision stated that both the agreement *and* "the construction thereof" would be governed by Michigan law, "[c]learly, the clause refer[red] to more than construction of the agreement; otherwise the first six words would be surplusage." *Id.* at 1139–40. On the other hand, the Court reasoned that if the clause had said only "that its construction would be governed by the law of Michigan, the plaintiffs would have support for their argument that it does not apply more generally." *Id.* at 1140. In detail, the court cited to *Caton v. Leach Corp.,* 896 F.2d 939, 943 (5th Cir. 1990), in which the Fifth Circuit found a choice of law provision applicable only to the construction of a contract, and not the plaintiff's tort claims, where it provided only that the "agreement shall be construed under the laws of the State of California." *Id.* (citing *Caton*, 896 F.2d at 943). The *Caton* court "contrasted the narrow clause in that case with an example of broader language, 'govern, construe and enforce all of the rights and duties of the parties arising from or relating in any way to the subject matter of this contract,'" which would have reached beyond "pure contract claims." *Id.* (citing *Caton*, 896 F.2d at 943 n.3). The *Moses* court explained that the provision at issue in its case fell between the two

14

extremes discussed by the *Caton* court, yet it was broad enough to cover plaintiffs' tort claims. *Id.*

In this case, the relevant language in the parties' choice of law clause provides that the "Master Agreement shall be governed in all respects by the laws of the Commonwealth of Kentucky and not the law of conflicts." [DN 1 at 38.] As in *Moses*, this provision does not merely provide that the MSA shall be construed according to Kentucky law. [*See id.*] Rather, it provides that the entire contract "shall be *governed in all respects*" by Kentucky law. [*Id.* (emphasis added).] This is analogous to the language in *Moses* which provided that the "[a]greement . . . shall be governed by the laws of the state of Michigan." *Moses*, 929 F.2d at 1139. Further, as in *Moses*, Corizon is "not asserting a non-contractual claim or one that arose incidentally out of the contractual relationship. Rather, [it is] seeking to avoid enforcement of the contract itself." *Id.* at 1140. For example, Corizon specifically seeks "rescission of the IDOC Schedule because Defendants' unfair and deceptive acts and practices render the IDOC Schedule void." [DN 1 at 17.] In other words, Corizon specifically "put[s] the validity of the contract in issue, and such a claim would appear to be encompassed by the language" in the choice of law provision stating that the "Master Agreement shall be governed in all respects" by Kentucky law. *Moses*, 929 F.2d at 1140. Accordingly, as in *Moses*, "[t]o the extent [Corizon] base[s] [its] claims directly on the alleged violations of specified [Idaho and Tennessee] statutes, without reference to the law of [Kentucky], [it] failed to assert a claim upon which relief could be granted." *Id.* Therefore, Corizon's ICPA and TCPA claims must be dismissed.

3. **Breach of Contract**

Finally, Defendants argue that Count IV of the complaint, which contains a breach of contract claim, should be dismissed with regard to the individual defendants, Ulrich, Jarrett, and

Wurth, as the only parties to the MSA are Corizon and CorrecTek. [DN 32-1 at 5–6.] In response, Corizon states that it "agrees that Defendants Ulrich, Jarrett, and Wurth are not individually liable for CorrecTek's breach of its contract with Corizon . . . As the complaint indicates, Corizon directs these claims squarely and exclusively at CorrecTek." [DN 35 at 15.] Accordingly, because Corizon only alleges breach of contract against CorrecTek, the portion of Defendants' motion seeking dismissal of Corizon's breach of contract claim against Ulrich, Jarrett, and Wurth is denied as moot.

CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** as follows:

1. Defendants' Motion to Dismiss, [DN 32], is **GRANTED IN PART AND DENIED IN PART**. Counts II and III of Plaintiff's complaint are **DISMISSED WITH PREJUDICE**. Counts I and IV may proceed.

2. The Court's Scheduling Order, [DN 62], is hereby **AMENDED** to assign this matter for a jury trial on **Monday, June 25, 2018, at 9:00 a.m. CDT**.

Date:

cc: Counsel of Record