UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:17-CV-00035-TBR

CORIZON HEALTH, INC.,                                                    PLAINTIFF

v.

CORRECTEK, INC., *et. al*,                                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on four pending motions. First, Defendants CorrecTek, Inc., Ulrich Medical Concepts, Inc., Burton Ulrich, Daniel Jarrett, and Matt Wurth filed a motion for summary judgment, [DN 102], to which Plaintiff Corizon Health, Inc. responded, [DN 108; DN 107],[1] and Defendants replied, [DN 109.] Second, Plaintiff filed a motion for summary judgment, [DN 107], to which Defendants responded, [DN 110], and Plaintiff replied, [DN 114.] Additionally, Plaintiff filed motions to exclude testimony from Defendants' expert witnesses Steven Heck and Dr. Richard Taylor, M.D. [DN 111; DN 112.] Defendants responded in opposition, [DN 113; DN 115], and Plaintiff replied, [DN 117; DN 118.] Fully briefed, these matters are ripe for adjudication. For the reasons stated herein, Plaintiff's motion for summary judgment is **DENIED**. Plaintiff's motion to exclude Steven Heck is **GRANTED IN PART AND DENIED IN PART** and its motion to exclude Dr. Richard Taylor is **GRANTED IN PART AND DENIED IN PART**. The Court will defer its ruling on Defendants' motion for summary judgment pending further briefing from the parties on the issue of the applicability of contract provisions limiting damages.

---

[1] Corizon incorporated its response in opposition to Defendants' motion for summary judgment and its memorandum in support of its own motion for summary into the same document, which is filed twice in the record. [DN 107-1 (Response and Memorandum in Support of Motion for Summary Judgment); DN 108 (Response and Memorandum in Support of Motion for Summary Judgment).] For clarity's sake, the because Docket # 107 and 108 are identical, the Court will cite only to Docket # 107 when referring to both Corizon's response and its motion for summary judgment.

BACKGROUND

Plaintiff Corizon Health, Inc. ("Corizon") is a healthcare provider for correctional facilities throughout the United States. Defendant CorrecTek, Inc. ("CorrecTek") licenses electronic medical records ("EMR") and electronic medication administration records ("eMAR") software to correctional healthcare providers. CorrecTek is an affiliate of Defendant Ulrich Medical Concepts, Inc. ("UMC"). According to CorrecTek and UMC's founder, the two companies are "one organization." [DN 107-2 at 5 (Burton Ulrich Deposition).]

Several basic facts of this matter are not in dispute. In early 2012, CorrecTek and its representatives began making sales pitches to Corizon "in an effort to have Corizon license CorrecTek's EMR." [DN 88 at 3, ¶ 12 (Amended Complaint).] The three individual Defendants, Burton Ulrich, Daniel Jarrett, and Matt Wurth, each of whom are affiliated with CorrecTek, were each involved with selling CorrecTek's EMR to Corizon. [*Id.*]

On January 26, 2012, Ulrich, the CEO of CorrecTek, and Jarrett, the President of CorrecTek, made a presentation to Corizon representatives in Paducah, Kentucky. [*Id.* at 3, ¶ 13.] As part of the presentation, CorrecTek sent a document entitled "EMR Overview" to Corizon's Nashville, Tennessee office. [*Id.* at 4, ¶ 14.] Therein, CorrecTek made several statements about its software, including that its EMR provides instant access to labs, medications, orders, and documentations for all patients, streamlines healthcare operations, and reduces health care costs. [DN 88-1 at 4 (EMR Overview).] The EMR Overview further stated that "[c]ase studies have proven that with the implementation of the CorrecTek EMR system, correctional facilities can benefit from drastic reductions in health care costs per inmate (up to 20%) and find similar reductions (up to 85%) in daily inmate health grievances." [*Id.*] Additionally, the EMR Overview included a statement that the EMR can be customized to fit the needs of each facility, including

by customizing things like entry screens, word documents, forms, templates, orders, reports, and user records. [*Id.* at 13.] The EMR Overview included numerous other representations about the EMR software, including that "data is entered very quickly, thoroughly and accurately," the software has "automated prescriptions and electronic prescribing," "full reporting capabilities (virtually all fields are reportable)," and it is the "most customizable, powerful and robust EMR available." [*Id.* at 5–6, 10.]

Also in early 2012, CorrecTek sent Corizon a document called "CorrecTek Cloud Infrastructure and Support Overview" to Corizon's Nashville office. [DN 88 at 6, ¶ 19.] That document stated that the "CorrecTek Cloud is a cost effective and easy way to implement and maintain your CorrecTek application," it "provides all necessary server infrastructure," is "supported 24 hours a day so that if users in the third shift are having problems with the system they can get the help they need," and "[s]canning documents in the CorrecTek cloud is literally as easy as pressing a button." [*See* DN 88-2 (CorrecTek Cloud Infrastructure and Support Overview).]

In March of 2012, Ulrich, Jarrett, and Wurth, the Chief Technical Officer of CorrecTek and Ulrich Medical Concepts, made a presentation to about twenty Corizon employees at CorrecTek's Paducah, Kentucky office. [DN 88 at 7, ¶ 21.] During that presentation, Defendants relied on a PowerPoint presentation titled "An Executive Overview of CorrecTek." [*Id.* at ¶ 22; DN 88-3 (Executive Overview PowerPoint).] The Executive Overview explained numerous other features of the EMR, including that it has "powerful end user configuration," a "completely integrated report writer," and "[v]irtually every field in CorrecTek is a reportable field." [*See* DN 88-3.] During the presentation, Ulrich also stated that the EMR "improves productivity and patient safety" and that CorrecTek was a "national leader" and "expert" in the realm of

correctional electronic medical records. [DN 88 at 8, ¶ 25.] Jarrett and Wurth also attended the presentation and made similar representations. [*Id.* at ¶¶ 26–27.]

On September 5, 2012, Ulrich, Jarrett, and Wurth gave a presentation to Corizon employees and members of the Idaho Department of Corrections (IDOC) in Idaho. [*Id.* at ¶ 28.] At that time, "the IDOC was considering installing an eMAR (not the entire EMR) at one of its correctional facilities." [*Id.* at ¶ 30.] During this meeting, Ulrich used a PowerPoint presentation titled "System Overview: An introduction to the system for new eMAR users" ("System Overview")." [*Id.* at ¶ 31; DN 88-4.] Corizon contends that Ulrich, Jarret, and Wurth made several representations at this meeting using the System Overview, including that CorrecTek's eMAR system "manages medical information," manages patient allergies, can "create and manage Orders related to patient care such as . . . Glucose testing . . . Referrals, X-Rays, etc," and, as part of the configuration process, CorrecTek would "configure facility data." [*See* DN 88-4.] Brad Beasely attended this meeting on behalf of Corizon and took notes of the contents of the meeting. [DN 88 at 10, ¶ 33.] Though Beasely's notes reflect that Jarret stated that the eMAR can perform "automatic medication renewal," [DN 88-5], Defendants deny that Jarrett ever made this statement. [DN 92-4, ¶ 34 (Defendants' Answer).]

On January 16, 2013, Corizon and CorrecTek entered into a Master Software License and Support Services Agreement (the "MSA"). [*Id.* at ¶ 39; DN 88-7 (MSA).] The MSA was the parties' general agreement, and stated that any "Licensed Software" Corizon would purchase from CorrecTek in the future would be licensed pursuant to "Schedules" the parties would execute to the MSA. [*See* DN 88-7.] The parties entered into two amendments to the MSA, one on July 23, 2013 and one on March 25, 2015. [*See* DN 88-8 (MSA Amendments).]

"On July 30, 2013, the State of Idaho issued a Request for Proposal (RFP) for the provision of healthcare services in all IDOC facilities. The RFP required the entity awarded the contract to 'implement and deploy' an EMR, including an eEMAR, for all inmates in IDOC's facilities." [DN 88 at 12, ¶ 43.] Corizon responded to the RFP and included in its response some of the information CorrecTek had previously sent it about its software, including the EMR Overview, the CorrecTek Cloud document, and various other marketing materials. [*Id.* at ¶¶ 46–47.] In the marketing materials, CorrecTek made such statements as "[r]eports can be run on one offender, a group of offenders or the entire offender population," "[h]istoric patients can be included in a report when needed," and the eMAR "[i]ntegrates with the Pharmacy Vendor," both "[s]ends orders to and receives confirmation from the IDOC pharmacy vendor," and "[a]utomatically adjusts inventory levels as medications are received from the pharmacy." [*See* DN 88-9 (CorrecTek Marketing Materials).]

On December 4, 2013, IDOC and Corizon met with CorrecTek representatives, including Ulrich and Wurth, in Idaho. [DN 88 at 13, ¶ 50.] At the meeting, Corizon and the IDOC inquired into the configurability, functionality, and productivity of CorrecTek's EMR and eMAR. [*Id.* at ¶ 51.] Corizon alleges that, in response, the CorrecTek representatives made many statements, including that the software was "robust" and "state of the art," that it was "fully configurable," that it "could generate any reports" that Corizon and the IDOC required, that CorrecTek could create any forms that Corizon needed, that its eMAR could properly manage the administration of patient prescriptions, that the system would increase productivity, and that its "system could automatically make provider referrals based upon patient responses to certain information." [*Id.* at ¶ 52.] Defendants admit to making most of these representations, however, they "deny that

Ulrich and Wurth made representations that 'Its software could generate any reports required by Corizon, IDOC and court orders imposed on IDOC.'" [DN 92 at 7, ¶ 52.]

According to Corizon, in reliance on Defendants' many representations, it executed the Schedule to Master Service Agreement Dated March 4, 2014 (the "IDOC Schedule").[2] [DN 88 at 15, ¶ 53.] Pursuant to the IDOC Schedule, Corizon would license CorrecTek's EMR and eMAR for its contract with the IDOC. [*Id.*] From July 22, 2014 to August 8, 2014, representatives from both companies met in Idaho for Conference Room Pilot (CRP) meetings. [*Id.* at ¶ 57.] At the second meeting on August 8 in Idaho, Corizon highlighted several requirements for the IDOC system, including "comprehensive, user-friendly reporting and required field technology." [*Id.*] Corizon contends that, on August 12, 2014, CorrecTek indicated that it could configure the software to satisfy these requirements, [DN 88 at 16, ¶ 58], but Defendants deny ever confirming that this could be done, [DN 92 at 8, ¶ 58.]

Corizon alleges that, in reliance on Defendants' alleged assurances that the software could be configured to meet IDOC's needs, Corizon "did not cancel the IDOC Schedule." [DN 88 at 16, ¶ 59.] Pursuant to the terms of the First Amendment to the MSA, if Corizon had canceled the IDOC Schedule no less than 181 days before the "Target Go Live Date" for the EMR, it would have only owed 10% of the license fee. [*See* DN 88-8.] Therefore, according to Corizon, "[i]f CorrecTek had accurately represented the functionality and limitations of the CorrecTek EMR rather than accepting the vast majority of configuration on August 12, 2014, after the Conference Room Pilot, Corizon could have recovered 90% of the license fee paid under the IDOC Schedule consistent with the MSA." [DN 88 at 16, ¶ 62.]

---

[2] Defendants admit that Corizon relied on their representations with the exception of the alleged representation by Jarrett that the eMAR performs "automatic medication renewal" and the representation by Ulrich and Wurth that the EMR could generate any reports Corizon, the IDOC, and the courts required. [DN 92 at 7, ¶ 52.]

Ultimately, according to Corizon, CorrecTek, Jarret, Ulrich, and Wurth's many representations about the features of the CorrecTek software proved to be inaccurate in countless ways. [*Id.* at 16–22.] For instance, Corizon claims that the EMR was not robust or state of the art because it did not have "required form field technology," "allow for pre-defined dropdown choices in key fields," it "permitted the option for multiple inconsistent entries," "did not allow for a scanning capability that would allow healthcare providers to attach scanned documents to an encounter form," "did not permit a formulary update," and "did not cache medication dosing." [*Id.* at 16–18.] According to Corizon, these are all things that a robust, state of the art EMR would have been able to do.

Corizon further claims that the EMR was not "fully configurable," as CorrecTek represented, because it cannot "provide the reports, forms, and system features required by Corizon and the IDOC," cannot "auto-populate vital information on each form," cannot "provide the necessary comprehensive reports," which meant that "the EMR could not provide accurate data on monthly reporting that Corizon was required to submit to the IDOC." [*Id.* at 18–19.] Corizon also asserts that it was false to represent the eMAR as able to manage prescriptions, because it "does not properly track and inform users of prescription schedules and dosing requirements, which has resulted in potentially dangerous situations," "was unable to integrate with pharmacy vendors, including Pharmacorr," and could not perform "automatic medication renewal." [*Id.* at 19–21.]

Corizon asserts that the EMR did not increase productivity, as its shortcomings required Corizon to resort to paper recordkeeping, healthcare providers spent substantial time completing records, and the software ran much more slowly than it did during CorrecTek's demonstration. [*Id.* at 21.] Additionally, Corizon alleges that "CorrecTek's representations that the 'CorrecTek

Cloud' provides all necessary server infrastructure and that CorrecTek provides 24/7 technical support were also false . . . evidenced by the almost weekly crashes of the system and Corizon's inability to communicate with CorrecTek to resolve such crashes, despite Corizon's many attempts, which put patients' health at risk." [*Id.* at 22, ¶ 89.]

On October 27, 2015, Corizon notified CorrecTek, via letter, of the alleged deficiencies of the software. [*Id.* at 22, ¶ 92.] CorrecTek responded in a December 9, 2015 letter in which it denied any responsibility for the claimed issues. [*Id.* at ¶ 93] In a letter dated February 2, 2016, Corizon's counsel again outlined the alleged misrepresentations and inadequacies regarding CorrecTek's software and provided written notice that Corizon never accepted the software within the meaning of the IDOC Schedule and was terminating the IDOC Schedule. [*Id.* at 23, ¶¶ 94–95.] Corizon demanded a full refund of the licensing fees it paid to CorrecTek. [*Id.* at ¶ 97.]

Corizon filed suit against CorrecTek, Ulrich Medical Concepts, Ulrich, Jarrett, and Wurth alleging fraud, violations of the Idaho Consumer Protection Act, violations of the Tennessee Consumer Protection Act, negligent misrepresentation in a commercial transaction and breach of contract. [DN 88 at 24–28.] The parties have engaged in discovery, and now both move for summary judgment. [DN 102; DN 107.]

STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining

whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

When the parties have filed competing motions for summary judgment, as is the case here, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Hensley v. Grassman*, 693 F.3d 681, 686 (6th Cir. 2012) (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)). The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

## DISCUSSION

### A. Defendants' Motion for Summary Judgment

Defendants make two primary arguments in their motion for summary judgment. First, Defendants argue that they are entitled to summary judgment on each of Plaintiff's claims because, even assuming any misrepresentations were made, "those statements related to either predictions of future intent or were matters of opinion related to commercial qualities" rather than a "past or present material fact." [DN 102-1 at 6, 8.] Second, Defendants argue that, even if

Plaintiff is entitled to damages, those damages should be capped pursuant to the parties' agreement and the economic loss doctrine. [*Id.* at 11–13.]

### 1. Misrepresentation

In their motion for summary judgment, Defendants argue that "[t]he root element of each of [Corizon's] claims is the alleged misrepresentations made by CorrecTek." [*Id.* at 9.] For the most part, this is correct, and Corizon does not dispute as much. [DN 107-1 at 22 (Noting that "Corizon's central claims all involve Defendants' repeated misrepresentations.").] For instance, in support of its claim of fraud in Count 1 of its amended complaint, Corizon alleges that Defendants made various misrepresentations and that "Defendants knew about the falsity of these misrepresentations at the time they were made and intended Corizon to justifiably rely on these misrepresentations and enter into the MSA and its amendments and the IDOC Schedule." [DN 88 at 24, ¶ 104.] In Count 2, which alleges violations Idaho Consumer Protection Act ("ICPA"), Corizon alleges that "Defendants' acts or practices set forth above are unfair and deceptive acts or practices in the conduct of trade or commerce" and that "Defendants knew or should have known that the information they provided to Corizon was untrue." [*Id.* at 25, ¶¶ 111–12.]

Similarly, in Count 3, alleging violations of the Tennessee Consumer Protection Act ("TCPA"), Corizon asserts that Defendants "Represent[ed] that goods or services have . . . characteristics . . . that they do not have . . .", "Represented that goods or services are of a particular standard, quality or grade [when such goods or services] are of another," and that such "acts or practices were willful and knowing." [*Id.* at 26, ¶¶ 120–21 (quoting Tennessee Code Ann. § 47-18-104(b)(5), (b)(7)).] In support of Count 4, negligent misrepresentation in a commercial transaction, Corizon alleges that "Defendants induced Corizon to enter into the

MSA, Amendments to the MSA, and the IDOC Schedule and make payments thereunder with misrepresentations upon which Corizon relied to its detriment." [*Id.* at 27, ¶ 126.] Finally, for Count 5, breach of contract, Corizon alleges, in part, that "[b]y materially misrepresenting the functionality of the CorrecTek EMR even upon notice of the degree of required customization, CorrecTek deprived Corizon of th[e] contractual remedy" of recovering 90% of the licensing fee Corizon paid. [*Id.* at 28, ¶ 140.]

As an initial matter, Defendants state that they "deny that any misrepresentations were made." [DN 102-1 at 6.] However, for purposes of their motion for summary judgment, Defendants assume that there were and argue that, even so, each of Corizon's five claims fail because any such misrepresentations related only to future actions, opinions, or predictions, which are insufficient to succeed on fraud and misrepresentation claims under Kentucky law. Defendants rely exclusively on two cases in support of this argument: *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544 (Ky. 2009) and *CWI, Inc. v. Smartdog Servs., LLC*, No. 1:15-CV-00139-GNS, 2016 WL 2654085 (W.D. Ky. May 9, 2016).

In *Flegles*, Flegles, Inc., a family owned lumber business, sued defendant, TruServ Corp., alleging that TruServ fraudulently induced Flegles to expand its business due to "TruServ's faulty expansion advice as well as its failure to provide accurate financial reports." *Flegles*, 289 S.W.3d at 548. Specifically, after Flegles asked TruServ to perform business audits "to help determine whether an expansion was feasible and if so what form the expansion should take," TruServ used a computer program to analyze financial and other data "and generated a 500–page report with projections indicating that Flegles' desired expansion to a 32,000 square-foot facility could be profitable if the new store included a product rental program." *Id.* Flegles went on with the expansion; however, it "encountered higher than expected building costs, which necessitated

substantial debt. Also, owing largely to a downturn in the local construction industry, its business during the new store's first three years did not meet TruServ's projections, particularly the projections regarding rental profits." *Id.* Though a jury awarded Flegles damages for fraud, the Kentucky Court of Appeals reversed, finding that TruServ's "statements of mere opinion or statements about the future [could] not support a claim of fraud." *Id.*

The Supreme Court of Kentucky affirmed, explaining "that forward-looking opinions about investment prospects or future sales performance such as those involved in this case generally cannot be the basis for a fraud claim." *Id.* at 549. The court explained, in part, that when

> [c]onfronted with the unavoidable fact that the 1996 Audit and the 1999 Guide [we]re projections about future events, Flegles maintains that TruServ misrepresented the past or existing facts on which they were based. Flegles complains that TruServ misrepresented the reliability of its business audits in several ways: by characterizing them as "customized" when they were based in part on the average performance of TruServ members; by referring to the "Just Ask" rental program as a "cash cow" and estimating the return from that program on the basis, again, of averages not necessarily reflective of Flegles' circumstances; and in the 1999 Guide by generating a projection of the rental program's performance based on optimistic market assumptions but failing to reveal two projections based on less optimistic assumptions. None of these allegations constitutes the sort of misrepresentation of objective fact required by the aforementioned exceptions.

*Id.* at 550. The court noted, for instance, that "the 'customized' and 'cash cow' references are nothing but trade talk or 'puffing,' which is not actionable as fraud." *Id.* (citing *McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky. 1955)). Moreover, the court stated that TruServ's "mere optimism, even excessive optimism, is not actionable" as "Flegles, in business for over seventy years, did not need TruServ to tell it that market projections are subject to many variables and that less desirable results are always possible." *Id.* Finally, TruServ included with its audits "disclaimers that they were based upon estimates and averages and were 'for general

guidance only and do not represent any guarantee of performance.' Disclaimers . . . put the opposing party on notice that projections ought not to be uncritically relied upon." *Id.*

Next, in *CWI*, the parties, plaintiff CWI and defendant SmartDog, executed an agreement pursuant to which "SmartDog would provide software consulting services to CWI." *CWI*, 2016 WL 2654085, at *1. "According to Plaintiff, SmartDog represented during negotiations that its employees would 'primarily' conduct most of the work. During the performance of work under the Agreement, SmartDog allegedly breached its terms by utilizing subcontractors rather than SmartDog employees." *Id.* (internal citations omitted). The court found, however, that CWI's fraud claim was based on an alleged oral misrepresentation SmartDog made *before* the agreement was executed that pertained to how it would act in the *future*. *Id.* at *2. However, the parties' agreement contained a merger clause which stated, in part, that "[t]his Agreement supersedes all previous Agreements, whether oral or written." *Id.* The court explained that, "[u]nder Kentucky law . . . 'parties may not base a fraud in the inducement claim on their reliance on oral representations contrary to the terms of written agreements or disclaimers that they have acknowledged in writing.'" *Id.* (quoting *Fifth Third Bank v. Waxman*, 726 F. Supp. 2d 742, 752 (E.D. Ky. 2010); and citing *Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. App. 2003)). Accordingly, the court dismissed CWI's fraud claim. *Id.*

According to Defendants, "all of Corizon's claims are based upon the CorrecTek Defendants' alleged misrepresentations concerning the quality and capability of the software system or about the future intent to configure the software system." [DN 102-1 at 10.] Defendants contend, however, that applying *SmartDog* and *Flegles*, "those representations, even if made, would not support Corizon's case. Consequently, a summary judgment should be entered in favor of CorrecTek." [*Id.*] Defendants also alternatively argue that, if the "Court is not

inclined to dismiss the entirety of Corizon's claims . . . then this Court should dismiss at minimum that portion of Corizon's claims premised upon statements of opinion, statements of future intent, and sales talk related to matters of optimistic commendation, which are prohibited pursuant to the *SmartDog* and *Flegles* cases." [*Id.*] Additionally, Defendants cite to a merger clause contained in the parties' Master Services Agreement which states "This Master Agreement constitutes the entire agreement between the Parties concerning the subject matter hereof with the exception of any specific written Schedules that outline the Parties' rights and obligations surrounding specific services/products being provided to CUSTOMER's Correctional Clients." [DN 88-7 at 18 (MSA).] Defendants argue that, similar to *CWI*, the merger clause in the MSA forecloses Corizon's claims about alleged misrepresentations relating to future conduct that took place before the MSA or its Amendments. [DN 102-1 at 7.]

In their response to Corizon's motion for summary judgment, Defendants include a chart (the "Chart") listing out approximately seventy-two alleged misrepresentations or conditions and identifies each as either "future intent or conduct," "opinion/sales talk," or barred by the merger clause in the parties' agreement. [*See* DN 110-2 at 2–9 (Chart).] The Chart also includes a box to check which of the alleged misrepresentations only allow for consequential damages. [*See id.*] Defendants check multiple boxes for each of the seventy-two alleged misrepresentation but do not offer any analysis or explanation in their brief.

With regard to the representations Defendants claim relate to future intent or future conduct within the meaning of *Flegles*, the Court disagrees. In *Flegles*, the "future events" at issue dealt with defendant's advice and opinions about whether plaintiff's proposed business expansion would be profitable and successful. *Flegles*, 289 S.W.3d at 549–50. There, the court explained that "[a] mere statement of opinion or prediction may not be the basis of an action" for

misrepresentation, meaning "that forward-looking opinions about investment prospects or future sales performance . . . generally cannot be the basis for a fraud claim." *Id.* at 549 (quoting *McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky. 1955)).

Defendants' representations are not analogous to those in *Flegles*, however. For example, Defendants claim that all of the following statements made in the EMR Overview were mere predictions about the future: "CorrecTek gives you instant access to every lab, medication, order, and medical documentation for any specific inmate or the whole population," "CorrecTek correctional EMR system streamlines healthcare operations for county jails and privately owned/contracted facilities," "Case studies have proven that with the implementation of the CorrecTek EMR system, correctional facilities can benefit from drastic reductions in health care costs per inmate (up to 20%) and find similar reductions (up to 85%) in daily healthcare grievances," "In CorrecTek, data is entered quickly, thoroughly, and accurately," and "Unlike paper systems, it takes only seconds to enter data." [DN 110-2 at 2–3; DN 88-1 at 1, 5.]

Defendants likewise contend that representations made in its Cloud and Infrastructure and Support Overview document were merely about future issues: "The CorrecTek Cloud infrastructure is supported 24 hours a day so that if users on the third shift are having problems with the system they can get the help they need." [DN 110-2 at 4; 88-2 at 5.] Moreover, Defendants contend that their representations that the software could be customized to Corizon's needs related to future intent or conduct. [DN 110-2 at 5.] However, these representations, unlike those at issue in *Flegles* and *CWI*, do not constitute "opinions or predictions" or "future intent" about the performance of the CorrecTek software. Rather, these representations, and numerous others Defendants include in the Chart, are about explicit features and capabilities of the EMR software. Accordingly, Defendants are not entitled to summary judgment on this ground.

With regard to the representations Defendants claim are barred by the merger clause in the MSA, the Court also disagrees. In *CWI*, the "oral misrepresentation to act in the future" at issue was the alleged statement that defendants' employees, rather than independent contractors, would perform most of the work under the parties' agreement. *CWI*, 2016 WL 2654085, at *2. There, the court explained that this oral representation was contradicted by the express terms of the contract, which expressly stated that SmartDog reserved the right to subcontract, and the merger clause in the parties agreement, explaining that, "[u]nder Kentucky law . . . 'parties may not base a fraud in the inducement claim on their reliance on oral representations contrary to the terms of written agreements or disclaimers that they have acknowledged in writing.'" *Id.* (quoting *Fifth Third Bank*, 726 F. Supp. 2d at 752). In *CWI*, the merger clause stated that "[t]his Agreement supersedes all previous Agreements, whether oral or written." *Id.*

Here, however, none of the representations Defendants allege are barred by the parties' merger clause. As the Court noted above, that clause reads as follows: "This Master Agreement constitutes the entire agreement between the Parties concerning the subject matter hereof with the exception of any specific written Schedules that outline the Parties' rights and obligations surrounding specific services/products being provided to CUSTOMER's Correctional Clients." [DN 88-7 at 18.] As an initial matter, unlike in *CWI*, the parties' agreement does not *contradict* any of the representations Corizon alleges Defendants made prior to its execution. Rather, nearly all of the representations Defendants made pertained to the characteristics of the software, which the MSA does not expressly mention. Moreover, the purpose of the merger clause is to negate any prior *agreements* that the contract may conflict with. Here, however, Defendants' representations as to the functions of its software are not "prior agreements" that the merger clause prevents from forming a basis for a fraud or misrepresentation claim. Rather, statements

about the features of a product, such as the EMR at issue here, certainly qualify as "a present or pre-existing fact" rather than "a promise to perform in the future." *CWI*, 2016 WL 2654085, at *2. Therefore, Defendants are not entitled to summary judgment on the basis of the merger clause in the MSA.

Finally, with regard to the representations Defendants claim constitute mere opinions or sales talk, which cannot form the basis of a misrepresentation claim, Defendants may be correct as to some of the representations Corizon alleges. In *McHargue v. Fayette Coal & Feed Co.*, the Court of Appeals of Kentucky (then Kentucky's highest court) explained that a salesman's representation that a milk cooler was "very efficient" and "would be easier to operate and be a time saver," though untrue, did not constitute actionable misrepresentation. 283 S.W.2d at 172. According to the *McHargue* court, "all this proved nothing more than 'sales talk' or 'puffing' which is universal and an expected practice. Such representations do not amount to actionable misrepresentation." *Id.*

Here, some of the alleged misrepresentations, such as that the EMR is "state of the art," "robust," "comprehensive," "fully configurable," and a "national leader" in the field of correctional electronic health records, for example, [*see* DN 88 at 8], may very well constitute sales talk or puffing. On the other hand, alleged misrepresentations that the EMR could generate referrals to health care providers based on patient responses to questions, that the EMR could generate any types of reports Corizon and the IDOC required, or that the EMR could perform automatic medication renewal, may not qualify as sales talk or puffing, but rather past or present material facts about the capabilities of the software. Overall, however, this is for a jury to decide. As the Court will explain below, jury issues exist as to Corizon's claims of fraud and misrepresentation (including its ICPA and TCPA claims), and the Court cannot cherry pick

among the more than seventy alleged misrepresentations to determine which, if any, constitute sales talk or puffing such that Defendants are entitled to partial summary judgment. Accordingly, the Court will instruct the jury on this issue at trial.

### 2. Damages and the Economic Loss Doctrine

Defendants next argue that, if they are not entitled to summary judgment and if Corizon is indeed entitled to damages, those damages are limited by either the economic loss doctrine or the MSA's Limitation of Liability Clause.

### a. The Economic Loss Doctrine

Kentucky's "'economic loss rule' prevents the commercial purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself, recognizing that such damages must be recovered, if at all, pursuant to contract law." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 733 (Ky. 2011). In *Giddings*, the Kentucky Supreme Court held

> that the economic loss rule applies to claims arising from a defective product sold in a commercial transaction, and that the relevant product is the entire item bargained for by the parties and placed in the stream of commerce by the manufacturer. Further, the economic loss rule applies regardless of whether the product fails over a period of time or destroys itself in a calamitous event, and the rule's application is not limited to negligence and strict liability claims but also encompasses negligent misrepresentation claims.

*Id.* The court elaborated on its holding that the doctrine extends to negligent misrepresentation claims, explaining that "when the alleged misrepresentations relate solely to the character, nature and performance of the product itself, the claim is essentially an attempt to make an end-run around the negotiated warranty in the parties' contract and the economic loss rule should apply just as it does to negligence and strict liability theories." *Id.* at 744. The court declined to determine whether the doctrine extends to fraud claims, however, stating that "that issue awaits

another case because the plaintiffs in this case pled fraud by omission, a claim that is unsustainable on the record before us, irrespective of the economic loss rule." *Id.* at 733.

Because the Kentucky Supreme Court has not determined whether the economic loss doctrine applies to fraud claims, courts applying to Kentucky law since *Giddings* have attempted to predict whether the Supreme Court would do. In *Ashland Hospital Corp. v. Provation Medical, Inc.*, upon which Defendants rely in their motion, the Eastern District of Kentucky "predict[ed] that the Kentucky Supreme Court would extend the economic loss rule to fraud claims." No. CIV.A. 14-44-DLB-EBA, 2014 WL 5486217, at *4 (E.D. Ky. Oct. 29, 2014). In so holding, the court explained that, though "[t]he Kentucky Supreme Court may not have decided whether the economic loss doctrine applies to fraud claims, [ ] it has indicated a preference for broader application of the doctrine" by holding that it applies not only to negligence and strict liability claims but also to negligent representation claims. *Id.* The *Ashland* court reasoned that "[a] finding that fraud claims are exempt from the economic loss doctrine would not only represent a departure from the general trend of treating negligent misrepresentation and fraud claims similarly, it would create patently inconsistencies with the [*Giddings*] court's prior reasoning." *Id.*

However, the Western District of Kentucky has not ruled quite as definitively. In 2013, this Court explained the Western District's position as holding that "[t]he economic loss doctrine precludes a plaintiff from recovering under a fraud theory *when that claim is intertwined with a breach of contract claim*." *Derby City Capital, LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 727 (W.D. Ky. 2013) (emphasis added) (quoting *Westlake Vinyls, Inc. v. Goodrich Corp.,* 518 F.Supp.2d 955, 968 (W.D. Ky. 2007)). In 2015, our sister District Court expanded upon this principle, explaining that, "[u]nlike some fraud claims which may be inextricably intertwined

with breach of contract claims, a *fraudulent inducement claim* centers around conduct occurring prior to the formation of the contract," and "[t]o expand the rule so as to bar a fraudulent inducement claim ... without further guidance from the Kentucky courts would eviscerate the claim of fraudulent inducement and would contravene contrary Kentucky case law." *Morris v. Tyson Chicken, Inc.*, No. 4:15-CV-00077-JHM, 2015 WL 7188479, at *5 (W.D. Ky. Nov. 13, 2015) (McKinley, J.) (emphasis added) (quoting *Davis v. Siemens Med. Sols. USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005), *aff'd*, 279 F. App'x 378 (6th Cir. 2008) (Heyburn, J)).

In *Morris*, the plaintiffs alleged that the defendant, Tyson Chicken, fraudulently induced plaintiffs to enter into contracts to grow Tyson's chickens. *Id.* at *1–2. There, the court refused to apply the economic loss doctrine, reasoning, in part, that it "disagree[d] with the Defendant's assertion that the crux of the Plaintiff's fraud claim is the defective nature of products provided under the contract. Instead, the Court finds that the crux of the Plaintiff's fraud claim is that they were fraudulently induced into entering into the contract in the first place." *Id.* at *5. This reasoning most closely fits the fraud claim Corizon asserts in this case. Here, in Corizon's amended complaint under its claim for "Fraud," Corizon alleges that "Defendants *induced Corizon to enter into the MSA and its amendments and the IDOC Schedule* with intentional, inducing material misrepresentations . . . upon which Corizon justifiably relied to its detriment." [DN 88 at 24, ¶ 101 (emphasis added).] Clearly, the fraud claim Corizon asserts here is one of fraudulent inducement to enter into the contract in the first place, rather than solely "the defective nature of products provided under the contract." *Morris*, 2015 WL 7188479, at *5.

Additionally, "courts applying Kentucky law unequivocally have refused to apply the rule to tort claims stemming from contracts for services." *Id.* at *4. Here, the MSA was a contract for both goods and services. Corizon and CorrecTek contracted for software, a product,

and for "professional support services," including both implementation and technical support. [*See, e.g.* DN 88-7 (Master Software License and Support Services Agreement); DN 88-10 at 4 (IDOC Schedule).] For example, in one clause, the MSA states that "The information provided to CORRECTEK during the customization process will be utilized to configure the Licensed Software database for the CUSTOMER." [DN 88-7 at 19, § 24.5.] According to Corizon, however, Defendants misrepresented that they could "fully configure" the software to Corizon's specifications. [DN 88 at 16, ¶¶ 58–63.] Corizon alleges that Defendants "misrepresented . . . the nature of 'implementation' services and related services that actually involved Defendants trying and failing to bridge the gap between their software's current capabilities and their grandiose representations." [DN 114 at 12–13.] Therefore, the misrepresentations Corizon alleges do not relate *solely* to the quality of the software, but also the services Defendants provided. Accordingly, under these circumstances, the economic loss doctrine does not apply to Corizon's claim of fraudulent inducement.[3]

### b.  The MSA's Limitation of Liability Clause

Defendants next argue, in the alternative, that if the economic loss doctrine does not apply, "then Corizon's damages should be capped at the amounts it agreed to in the MSA." [DN 102-1 at 13.] The "Limitation of Liability" clause of the MSA reads, in relevant part, as follows:

> each Party's liability to the other Party, regardless of the form of action, shall be limited to the amount that is equal to the total amount to be paid by CUSTOMER to CORRECTEK under the Schedules to this Master Agreement but not to exceed $250,000 per incident. In no event will either Party be liable to the other for . . . (ii) lost profits, incidental or consequential damages, even if advised of the possibility of such damages . . .

---

[3] Though it is unclear whether Defendants argue that the economic loss doctrine applies to Corizon's claims under the ICPA and TCPA, the Court notes that the doctrine, part of Kentucky common law, would not apply to limit recovery for statutory claims under Idaho and Tennessee law. *See, e.g.*, *Milner v. Windward Petroleum, Inc.*, No. 06-2563, 2007 WL 9706514, at *8 (W.D. Tenn. May 31, 2007) (Holding that the Tennessee "legislature intended to provide a cause of action under the TCPA for conduct that would otherwise be barred by the economic loss doctrine.").

[DN 88-7 at 10.] According to Defendants, this provision prohibits Corizon from recovering more than $250,000 in this action. [DN 102 at 12–13.] In its amended complaint, Corizon requests compensatory damages of not less than $1,500,000, punitive damages, statutory damages under the ICPA and TCPA, including treble damages, and reimbursement of all amounts it paid to CorrecTek. [DN 88 at 29.]

In response, Corizon argues, first, that the Limitation of Liability clause does not apply "because the contract is void for fraud." [DN 107-1 at 33.] Additionally, Corizon argues that the contract is also voidable under the ICPA and the TCPA.

"Kentucky law provides that where a contract is entered into in reliance on fraudulent representations, an action for rescission may be maintained." *Fifth Third Bank v. Waxman*, 726 F. Supp. 2d 742, 752 (E.D. Ky. 2010) (citing *Radioshack Corp. v. Comsmart, Inc.,* 222 S.W.3d 256, 261 (Ky. Ct. App. 2007)). Under the ICPA, a person "who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by this chapter, may treat any agreement incident thereto as voidable." Idaho Code Ann. § 48-608(1).

Similarly, the TCPA allows "[a]ny person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice . . . may bring an action individually to recover actual damages." Tenn. Code Ann. § 47-18-109(a)(1). Additionally, if the violation was "a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper, except that the court may not award exemplary or punitive damages for the same unfair or deceptive practice." Tenn. Code Ann. § 47-18-109(a)(3).

The TCPA states that "No provision of this part may be limited or waived by contract, agreement, or otherwise, notwithstanding any other law to the contrary. Tenn. Code Ann. § 47-18-113(a). It appears, therefore, that if Corizon were to succeed on its fraud, ICPA, and/or TCPA claims at trial, it may be correct that the MSA's Limitation of Liability clause would not apply. However, the fact remains that Corizon would need to prove these claims at trial before the Court can make this determination.

Second, Corizon argues that, even if the MSA is valid, the IDOC Schedule contradicts the MSA, and therefore the IDOC Schedule Controls. [DN 107-1 at 32.] The IDOC Schedule states that, if, after Corizon provides written notice of problems with the software, "CORRECTEK has failed to either satisfactorily resolve the problems, or provide a timetable acceptable to CUSTOMER to resolve the problems, CUSTOMER shall have the right to terminate this Schedule upon written notice to CORRECTEK." [DN 88-10 at 4–5.] Then, "[u]pon such termination, CORRECTEK shall provide a full refund to CUSTOMER of all License Fee amounts paid for the Licensed Software, except for fees and expenses related to implementation services." [*Id.* at 5.] According to Corizon, therefore, it is entitled to recover *all* of the licensing fees it paid.

Third, Corizon argues that, even if the MSA clause applies, the "$250,000 per incident language" does not mean $250,000 total, as CorrecTek suggests, but $250,000 per misrepresentation or unresolved failure of the software. [DN 107-1 at 32–33.] This begs the question of how to define "incident" under the MSA. On the whole, the Court feels that it needs further briefing from the parties on the applicability of the Limitation of Liability clause of the MSA and the damages provision of the IDOC Schedule before it can rule on these issues. Specifically, the parties should address 1) whether and under what circumstances the MSA and

the IDOC Schedule could be void or voidable, 2) whether, if Corizon does not succeed on its fraud, ICPA, or TCPA claims at trial, and therefore the contract is not void or voidable, the Limitation of Liability clause or the damages provision of the IDOC Schedule would apply, and 3) how to define "incident" as that term is used in the Limitation of Liability clause of the MSA. The Court will defer ruling on Defendants' motion for summary judgment on the issue of the limitation on damages pending the parties' further briefing on that issue.

**B. Plaintiff's Motion for Summary Judgment**

Corizon moves for summary judgment only on its first three claims: fraud, violations of the Idaho Consumer Protection Act, and violations of the Tennessee Consumer Protection Act. [DN 107 at 1.] In its motion, Corizon argues repeatedly that "Defendants admit to making dozens of [ ] misrepresentations to persuade Corizon and IDOC to award CorrecTek the IDOC contract" and "also admit to the other critical elements required to establish liability for Corizon's consumer protection and fraud claims." [DN 107-1 at 28.] However, in the Court's view, the most Corizon has shown at this stage is that a jury *could* find in its favor on its consumer protection and fraud claims.

Under Kentucky law, a plaintiff asserting fraud must establish by clear and convincing evidence that the defendant made (1) a material misrepresentation, (2) which was false, (3) known to be false or made recklessly, (4) made with the intent that it be acted upon, (5) acted in reliance thereon, and (6) causing injury." *Progressive Specialty Ins. Co. v. Rosing*, 891 F. Supp. 378, 379 (W.D. Ky. 1995). Under both the Idaho and Tennessee Consumer Protection Acts, it is an unfair or deceptive act or practice to "[r]epresent[] that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Idaho Code Ann. § 48-603(7); Tenn. Code Ann. § 47-18-104(7).

Corizon correctly argues that Defendants admit to making nearly all of the representations about its software that Corizon asserts it did and further admit, for the most part, that Corizon relied on those representations.[4] [*See* DN 92.]

Corizon next argues that it has proven its damages,

> beginning with $763,977.96 in fees paid to CorrecTek. IDOC charged Corizon $127,600 in liquidated damages directly and exclusively for the delayed implementation of a functional EMR—the replacement for the CorrecTek EMR— that was a direct result of time wasted resolving the discrepancies between the EMR CorrecTek provided and the much better one Defendants misrepresented to Corizon and IDOC. Corizon suffered losses associated with wasted labor costs— $162,408—and travel expenses—$37,688.85—associated with attempts to implement the CorrecTek EMR.

[DN 107-1 at 29.]

Where Corizon falters, however, with its argument that "the undisputed evidence shows that Defendants acted with sufficient knowledge to satisfy an intentional or reckless standard that triggers increased liability under the statutes and clear liability for fraud." [*Id.* at 30.] While Corizon has certainly presented evidence to create a jury issue, it has not gone so far as to prove its claims without dispute at this stage.

During his deposition, Corizon representatives asked Ulrich whether he agreed with the statement from CorrecTek's EMR materials that said "instant access to . . . the health of your jail or prison population gives you the power to make timely decisions and document every encounter in seconds." [DN 107-2 at 13–14 (Ulrich Deposition).] Ulrich responded "I do not agree with the 'in seconds'" portion of that statement. [*Id.* at 14 (internal quotation marks added).] When asked to elaborate, Ulrich explained that "[s]ometimes you can have a

---

[4] Notably, Defendants deny that Jarrett ever made the statement that the eMAR can perform automatic medication renewal. [DN 92-4, ¶ 34.] They also deny, therefore, that Corizon could have relied on this representation. Defendants also deny that Ulrich and Wurth made representations that 'Its software could generate any reports required by Corizon, IDOC and court orders imposed on IDOC,'" and therefore that Corizon could have relied on this statement. [DN 92 at 7, ¶ 52.]

performance problem and you can't do it in seconds. It may take longer. This is not necessarily the fault of the software but you are not going to be able to do it in seconds . . . if I had read this, I would have . . . told Jana we don't need to say in seconds. We just need to say make timely decisions and document every encounter." [*Id.*]

Next, Ulrich testified that the CorrecTek software "could have been used for any Corizon form," however, when asked whether it was possible to enter a patient's chief complaint in "a narrative form from the patient's statement," Ulrich responded "You are right. In that case, this technology doesn't work well . . . We did accommodate it . . . But that's not a good solution." [*Id.* at 26–27.]

Corizon also asked Ulrich, Jarrett, and Wurth about the "case studies" mentioned in the EMR Overview. Sepcifically, the Executive Summary page of the EMR Overview includes a paragraph which states "Case studies have proven that with the implementation of the CorrecTek EMR system, correctional facilities can benefit from drastic reductions in health care costs per inmate (up to 20%) and find similar reductions (up to 85%) in daily healthcare grievances." [DN 88-1 at 3.] When asked whether he agreed with that statement, Ulrich responded "I do not know where Jana found that information . . . I don't know those" and "this is not something I wrote." [DN 107-2 at 16.]

Ulrich also responded to questions about the EMR's reporting capabilities. When asked whether it is correct that the feature where "CorrecTek alerts users when required pieces of information have not been entered for an encounter . . . just applied to structured data," he responded "It did. But it also did apply to an encounter, just not the free form text. So you have to pick an attending provider, you have to pick a location, a patient, a date and a time. They're required fields, just not around the free form text." [DN 107-2 at 17.] Ulrich confirmed that, "in

the context of free form text, then there would not have been at this point in time a required field technology." [*Id.*] Though these responses create a jury issue, the Court would not go so far as to say, as Corizon does, that "Ulrich confirmed, under oath, that he and the other Defendants misrepresented some of the most important features of their EMR when encouraging Corizon and IDOC to choose them over a competitor." [DN 107-1 at 13.] Rather,

When Corizon asked Jarrett about whether CorrecTek ever commissioned "case studies," he responded "No, we did not. I'm not aware of any study we commissioned for the purpose of creating this kind of, these numbers, no." [DN 107-6 at 10 (Jarrett Deposition).] However, Jarrett went on to explain "I didn't create these documents. I represent them but I didn't create them. Jana Barnes [Pozniak] created this." [*Id.* at 11.] During her deposition, Jana Pozniak testified "[t]here was a case study that was written for CorrecTek. One for Rutherford County Jail that I recall." [DN 107-7 at 5.] She could not recall any others specifically performed on the CorrecTek EMR. [*See id.*]

Corizon also cites to the declarations of two former CorrecTek employees. One, Paige Giles, worked at CorrecTek from 2013 to 2015 and participated in training CorrecTek customers. [DN 107-12 at 2 (Giles Declaration).] Giles states that she attended several presentations Ulrich gave to prospective clients, but that "such demonstrations were disconnected from the way the EMR actually works." [*Id.* at 2–3.] According to Giles, "[t]he reason the EMR ran so well in these demonstrations was because there was hardly any data in the EMR . . . [t]he large the amount of data in the EMR, the slower and more poorly the EMR ran." [*Id.* at 3.] In her opinion, "CorrecTek clients had been promised an EMR that CorrecTek did not deliver." [*Id.* at 5.]

Next, Brannon Sanford, who worked at CorrecTek from 2013 to 2016, observed that, "[d]uring my time at CorrecTek, the EMR worked better (quicker and with fewer problems) in

small jails . . . However, in large jails and prison systems where large amounts of data from multiple external systems flowed into the EMR, the EMR bogged down and ran very slowly." [DN 107-13 at 2.] Sanford stated that "[t]here was a night and day difference between the EMR's performance at the demonstration I attended versus its performance in reality, especially at large jails and prison systems." [*Id.*]

Certainly, Corizon has produced evidence in support of its fraud, ICPA, and TCPA claims. However, Corizon's burden at this stage as the Plaintiff is high. "In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's 'initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.''" *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (quoting *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1056 (6th Cir. 2001)). "In reviewing a motion for summary judgment, we must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party, and '[s]ummary judgment in favor of the party with the burden of persuasion ... is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact.'" *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting *Hunt v. Cromartie,* 526 U.S. 541, 553 (1999)).

Here, a trier of fact could find that several of the alleged misrepresentations, such as that the EMR was "robust", gave "instant access" to information, or allowed users to enter information "in seconds", constitutes mere sales talk or puffing rather than a misrepresentation as to a material fact. A trier of fact may also find that the software simply functioned as CorrecTek represented it would. Certainly, Corizon has evidence to refute these findings. But the Court cannot say that such evidence is so compelling such that "no reasonable jury would be free to

disbelieve it." *Surles*, 678 F.3d at 455–56. Accordingly, Corizon's motion for summary judgment on its fraud, ICPA, and TCPA claims is denied.

## C. Plaintiff's Motions to Exclude Testimony

Finally, Corizon moves to exclude testimony from two of Defendants' expert witnesses, Steven Heck and Richard Taylor, M.D. When a party challenges an opponent's expert witness, this Court must assume "a gatekeeping role" to ensure the relevance and reliability of the expert's testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert* to nonscientific expert testimony). Federal Rule of Evidence 702 guides the Court through this inquiry. The plain language of Rule 702 says, first, that an expert must be qualified to testify on account of his "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015). The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.' " *Burgett v. Troy-Bilt LLC*, 579 Fed.Appx. 372, 376 (6th Cir. 2014) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). A qualified expert may then testify so long as his opinions will aid the factfinder and are reliable, meaning the opinions are based on sufficient data, reliable methods, and the facts of the case. Fed. R. Evid. 702(a)–(d); *see also Clark v. W & M Kraft, Inc.*, 476 Fed.Appx. 612, 616 (6th Cir. 2012); *Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 854 (E.D. Ky. 2013).

There are a number of factors typically considered to resolve questions concerning the reliability (and admissibility) of expert testimony, but no list is exhaustive. *See Daubert*, 509 U.S. at 593–94; *see also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *Powell v. Tosh*, 942 F. Supp. 2d 678, 686–88 (W.D. Ky. 2013). Such factors may include

"(1) whether the theory or method in question 'can be (and has been tested)'; (2) whether it 'has been subjected to peer review and publication'; (3) whether it has a 'known or potential rate of error'; and (4) whether the theory or technique enjoys 'general acceptance' in the 'relevant scientific community.'" *Sierra Enterprises Inc. v. SWO & ISM, LLC*, 264 F. Supp. 3d 826, 834 (W.D. Ky. 2017) (quoting *Daubert*, 509 U.S. at 593–94).

Where a party challenges the testimony of a proffered expert for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or her] discipline." *Kumho Tire,* 526 U.S. at 149 (quoting *Daubert,* 509 U.S. at 592). Although a *Daubert* hearing is not a prerequisite, the court must ensure that the disputed testimony is both relevant and reliable. *See Clay v. Ford Motor Co.* 215 F.3d 663, 667 (6th Cir. 2000). In any case, the Court has considerable leeway over where to draw the line. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010) ("[W]here one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997))). The proponent of the expert testimony must establish its admissibility by a preponderance of the evidence. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

### 1. Steven Heck

Defendants' first expert witness is Steven Heck, who has long worked in the field of a healthcare technology. [*See* DN 111-1 (Expert Report of Steven Heck).] Heck started out in 1973 as a programmer, and by 1980, was working "as the technology lead to [the] healthcare practice in the Chicago office" at Price Waterhouse. [*Id.* at 2.] There, Heck "was directly responsible for approximately seventy-five implementations of the firm's Case-Mix and Cost Accounting

System for hospitals." [*Id.*] In 1985, Heck "became the first Healthcare Technology Partner at Price Waterhouse." [*Id.*] In that position, Heck "assisted in a litigation case related to an EMR that failed to perform." [*Id.*] He left Price Waterhouse in 1987 to join a start-up consulting company which, over the course of twenty years, became one of the most influential consulting firms in the healthcare technology industry. [*Id.* at 2–3.] Since 2009, Heck has been assisting start-up consulting firms and serving on healthcare boards. [*Id.* at 3.] He has written numerous articles and given several speeches on the topic of healthcare information management, including a presentation in 2013 at the Healthcare Information Management Systems Society conference on the topic of extracting value from EMRs. [*Id.*]

In preparation for his expert report and testimony in this case, Heck reviewed virtually the entire record, including Corizon's own expert's report, extensive written discovery, Corizon's amended complaint and Defendants' answer thereto, deposition testimony, Defendants' marketing material, and various emails produced by the parties. [*Id.* at 4–7.] Heck also interviewed Defendants Ulrich, Jarrett, Wurth, and CorrecTek staff members. [*Id.* at 7.] In reliance on this information, Heck rendered numerous opinions which he summarizes in his report. [*Id.* at 8–15.] Heck opines, for example, that:

- "Corizon fully understood what the software product could do after receiving multiple demonstrations and performing a comprehensive vetting process." [DN 111-1 at 8.]

- "Corizon currently uses the CorrecTek software product at ten other locations in the United States without any failures in implementation . . . Many of these other sites are much larger and more sophisticated than the Pocatello Women's Correctional Center." [*Id.*]

- "Corizon personnel met with CorrecTek personnel on multiple occasions for demonstrations and discussions regarding the software prior to signing the Idaho Schedule. Corizon fully vetted CorrecTek's product prior to signing that Schedule." [*Id.* at 9.]

- "Whenever any commercial software product (in this case "the Corizon Gold Standard") is customized it immediately creates more complexity, testing, and coordination. A great deal of the material that I read was discussion/debate revolving around poor communication, extensive customization . . . and the typical consequences of re-testing. These issues became more acute with the instability of Corizon Corporate; the sudden termination of Mr. Holman and the majority of the internal Corizon IT capabilities; and sudden termination of the CorrecTek contract." [*Id.*]

- Terms such as "state of the art," "robust," "comprehensive," and "fully configurable" are adjectives and objectives which "are very generic and change rapidly." [*Id.*]

- "EMR's come in many flavors. State-of-the-art, robust and comprehensive are marketing terms and rarely taken seriously." [*Id.*]

- "Corizon controlled all aspects of the implementation that failed . . . This level of control by Corizon was the same as it was at all other Corizon customers prior to the Idaho implementation." [*Id.* at 10.]

- "I find no evidence that any of the Defendants misrepresented the CorrecTek software or services." [*Id.*]

- "The leadership change [at Corizon during the implementation] was astounding. During the implementation in Idaho leadership at Corizon was in turmoil . . . It is my understanding that during the Idaho project Corizon went through three CEO's, three Presidents, four COO's, four VP's of IT or CIO's, five Corizon VP's who had responsibility over CorrecTek, two Project Managers, and two different Corizon IDOC Project Managers." [*Id.* at 11.]

- "Based on my training and experience, the failure of the subject Idaho project was not due to the fault of CorrecTek, but rather was due to an alarming lack of leadership on the part of Corizon. Corizon failed to follow the basis rules of successful implementation in the industry and its casting of blame on the Defendants defies the actual terms of the services contracted for and custom and practice in the industry." [*Id.* at 13.]

- "The fundamental rules and responsibilities of implementation best practices have been known for decades. These basic rules are not always followed and the consequences are very predictable . . . " [*Id.*]

- "In my expert opinion the Idaho project failed because of a lack of leadership on the part of Corizon. While appeasing IDOC, they approved a significant amount of configurations; extended the timeless and cost; while ignoring cautions from CorrecTek and common practices in the industry." [*Id.* at 15.]

Corizon does not appear to dispute that Heck is generally qualified to testify about healthcare technology. [*See* DN 111 at 4–5.] Indeed, the Court finds that Heck is qualified, based on his "knowledge, skill, experience, training, or education" in the field, as an expert generally in matters related to the healthcare technology industry. *See* Fed. R. Evid. 702; *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (Finding admissible "expert testimony derived largely from [the expert]'s own practical experiences throughout forty years in the banking industry.").

Corizon does argue, however, that "Heck's opinions on leadership, legal duties related to implementation, and the success or failure of other CorrecTek implementations should be excluded because he follows no coherent system and his opinions simply cannot 'help the trier of fact.'" [*Id.* at 4 (quoting Fed. R. Evid. 702(a)).] With regard to Heck's opinions about the alleged lack of leadership at Corizon, Corizon argues that "Heck articulates no particular test that he applied and no provable or disprovable theory of leadership that might be tested here, but offers to testify that Corizon showed 'an alarming lack of leadership' by 'fail[ing] to follow the basic rules of successful implementation in the industry.'" [DN 111 at 5 (quoting DN 111-1 at 12).] According to Corizon, "Heck's emphatic rhetoric on 'leadership' does not provide the kind of disciplined connection between data and opinion that *Daubert* and Rule 702 require." [*Id.*]

The Court is inclined to agree. Heck's area of expertise does not qualify him to render opinions about the quality of the leadership at Corizon during the implementation, and doing so would not "help the trier of fact to understand the evidence or to determine a fact in issue," as Rule 702 requires. Fed. R. Evid. 702(a). Heck *can* testify as to how EMR implementations are generally carried out and he can offer his opinion about whether, based on his knowledge, experience, and review of the record, the EMR implementation in this case was done in

accordance with generally accepted practices. However, opining that "the Idaho project failed *because* of a lack of leadership on the part of Corizon," [DN 111-1 at 15], is not an appropriate expert opinion in this case, and testimony of that kind will be excluded.

With regard to Heck's opinions about the parties' respective roles regarding the EMR implementation, Corizon takes issue with Heck's opinions that certain responsibilities are "ALWAYS" owned by the buyer while there are other things "[t]he software supplier is ALWAYS responsible for." [DN 111 at 7.] Corizon asserts that, through these opinions, Heck attempts to explain legal principles and legal duties of the parties, which "infringes on the Court's prerogative to instruct the jury on legal duties generally and on the effect of contractual provisions and Defendants' representations about their responsibility over implementation." [*Id.* at 7–8.] The Court disagrees with this argument in part. Though Corizon characterizes Heck's opinions as to certain "fundamental rules and responsibilities of implementation" as offering an opinion on the parties' "legal duties," this is not how Heck phrases his report. Rather, Heck opines that there are "basic rules" for implementation, including certain tasks that are "always" done by the buyer or "always" done by the software seller. [DN 111-1 at 13–14.] For the buyer, these include, according to Heck, selecting the system and considering obtaining third party assistance, designing, testing, and accepting the software, and organizational training. [*Id.* at 14.] For the software provider, these include providing the base product as advertised, which "consists of a database; a standard set of reports and screens to assist in workflow and data entry." [*Id.*] These are not opinions about the legal duties of the parties. Rather, they are opinions as to the normal roles of software providers and buyers in the healthcare industry. Generally speaking, this is a permissible subject for expert testimony. *See, e.g.*, *Sierra Enterprises*, 264 F.

Supp. 3d at 835 ("Callicotte's qualifications would certainly qualify him as an expert generally in matters related to the oil and gas drilling business.").

That being said, however, it is unclear from Heck's report whether he can lay a foundation for these particular opinions about which parties "always" have certain roles. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008) ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.") Heck did not explain in his report how his training and experience in the industry led him to form these opinions. Accordingly, at this time, the Court will reserve ruling on this aspect of Heck's proposed testimony. If Heck can lay the proper foundation for these opinions at trial, he can certainly testify about the standards, customs, and practices of software implementation in the healthcare industry. And if he does, Corizon will be free to challenge Heck's opinions through cross-examination and the presentation of its own, contrary evidence regarding CorrecTek's alleged representations about the division of responsibilities between the parties. *See Sierra Enterprises*, 264 F. Supp. 3d at 836 ("Expert testimony will not be excluded because a party alleges a factual dispute . . . Rather, the Supreme Court has stated that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (quoting *Daubert*, 509 U.S. at 596).

Finally, Corizon argues that "Heck also repeats and relies upon irrelevant and inaccurate assertions that other CorrecTek implementations in similar settings were successful." [DN 111 at 8.] Corizon states that "Heck has no independent knowledge and has conducted no investigations into the success or failure of CorrecTek systems at other sites. He has no independent knowledge

of and took no steps to investigate differences between the IDOC site and other sites and admits that 'honestly, [he does]n't know the difference between a jail and a department of corrections.'" [*Id.* at 8 (quoting DN 111-2 at 9 (Heck Deposition).] Heck also "has no evidence, other than his client's say-so that these implementations were successful or that the settings were comparable." [DN 117 at 2.] Additionally, Corizon contends that "[t]he details of CorrecTek implementations in jails and other facilities with different requirements are irrelevant to the issues surrounding Defendants' misrepresentations." [DN 111 at 8–9.] The Court is again inclined to agree. As an initial matter, the success of CorrecTek software at other Corizon locations is irrelevant to whether the CorrecTek Defendants misrepresented the goods and services Corizon was purchasing pursuant to the MSA and its Schedules for use at the IDOC *in this case*. Accordingly, his testimony in this regard would not help the jury determine a fact in issue. *See* Fed. R. Civ. P. 702(a). Moreover, Heck does not have expert knowledge, skill, or experience about Corizon's past implementation successes or failures. Rather, as the Court noted above, Heck is qualified to testify about the standard EMR implementation practices in the healthcare technology industry and compare those standards to what happened in this case, only to the extent his testimony would help the jury determine facts in issue. Accordingly, the Court will exclude Heck's testimony regarding the past successes or failures of CorrecTek software at different Corizon locations. Corizon's motion to exclude Heck's testimony is therefore granted in part and denied in part.

### 2. Richard Taylor, M.D.

Next, Corizon moves to exclude the expert testimony of Dr. Richard Taylor, M.D. [DN 112.] Dr. Taylor is "a practicing executive physician informatician with specific expertise in information technology (IT) and EMR implementation as well as broad experience with

physician relationships and EMR adoption." [DN 112-1 at 2 (Expert Report of Dr. Taylor).] Since 2013, Dr. Taylor has served as the Executive Vice President and Chief Medical Officer for MedSys Group, LLC, a healthcare IT consulting company based in Dallas, Texas. [*Id.*] Since 2015, Dr. Taylor took on the additional position of Chief Medical Informatics Officer for Geisinger Health System. [*Id.*] In that position, he has "specific responsibility supporting Health Care IT (HCIT) system selection and implementation, including EMR conversions. [His] most recent EMR implementation/conversion go-live was in May, 2017, and [he is] actively involved in EMR selection and additional implementation planning at this time." [*Id.*] Dr. Taylor has "assisted with EMR selection and implementation at sites including hospitals of all sizes, outpatient and ambulatory care sites, and institutional care settings." [*Id.*]

Like Heck, Dr. Taylor reviewed most of the record in this case in preparation for his expert testimony. This includes the MSA and its amendments, Corizon's expert's report, extensive written discovery, Corizon's amended complaint and Defendants' answer thereto, deposition testimony, Defendants' marketing material, and various emails produced by the parties. [*Id.* at 3–6.] Dr. Taylor also interviewed Defendants Ulrich, Wurth, and CorrecTek staff members and observed the 2014 CorrecTek software. [*Id.* at 3.] Based on his review of these materials, Dr. Taylor rendered several expert opinions, including the following:

- "It was not a misrepresentation to refer to the CorrecTek 2014 EMR as "State of the Art." [DN 112-1 at 7–8.]

- "The generally positive representations made in course of the sales process to Corizon are normal for EMR sales, did not constitute specific promises of unavailable features, and did not misrepresent the product." [*Id.* at 8–9.]

- "It was not a misrepresentation to state that the CorrecTek EMR could "require" date in specific fields, and . . . The initial absence of required free-text field functionality does not mean that the CorrecTek EMR lacked any critical quality or capability of an EMR and . . . The duty to enter correct information into a medical record is never delegable to a

software product and CorrecTek's EMR was not presented as able to satisfy this obligation in the absence of correct usage by clinical staff." [*Id.* at 9–10.]

- "CorrecTek did not misrepresent their ability to interface to pharmacy systems and . . . Interfacing difficulties with Pharmacorr do not suggest that CorrecTek software was deficient, cannot be attributed solely to CorrecTek, and are examples of common challenges in EMR implementation." [*Id.* at 10–11.]

- "CorrecTek's medication management functionality, while sophisticated, is not defective and . . . Patient safety events that occurred (missed doses and duplicate doses given to patients) cannot be attributed to malfunctions in the CorrecTek EMR." [*Id.* at 11–12.]

- "To the extent that Corizon interpreted CorrecTek's representations about automated referral and medication renewal functionality as eliminating human intervention, that interpretation is objectively unreasonable." [*Id.* at 12.]

- "CorrecTek's allergy drop-down functionality and configuration are not deficient relative to the state of the art for institutional EMRs, and . . . The ability to choose both NKDA and a specific allergy is not an unusual situation and is in fact necessary in many circumstances. It does not represent a deficiency in the EMR." [*Id.* at 12–13.]

- "CorrecTek's initial user training was not misrepresented, and . . . Attributing errors and safety events to 'training' does not constitute tacit admission that training was inadequate, but rather constitutes a normal and laudable effort by an EMR manufacturer to reduce errors by re-addressing problem workflows after go-live." [*Id.* at 13.]

- "CorrecTek did not misrepresent the reporting capabilities of their EMR." [*Id.* at 14.]

- "CorrecTek did not misrepresent their ability to provide appropriately trained staff for configuration and customization, and . . . CorrecTek supplied appropriate individuals according to the contract and performed necessary customization and build, and . . . Corizon, as the primary authority over build items and customization, bears significant responsibility for configuration 'scope creep' and resulting compromises in training and use. [*Id.* at 14–16.]

- "Initial stability issues, manifested primarily as system unavailability, were not the result of fundamental flaws in the CorrecTek software." [*Id.* at 16.]

- "The initial performance and user satisfaction issues with the CorrecTek software, while apparently genuine and significant, are not uncommon in EMR implementations and do not suggest that any misrepresentation or malfeasance was present prior to go-live, and . . . CorrecTek's customer support met or exceeded the contractual requirements." [*Id.* at 16–17.]

- "Corizon's decision to terminate the installation project, while completely within Corizon's authority as the owner both of the project and of criminal services at PWCC, did not result from any irremediable defect in CorrecTek's software." [*Id.* at 17–18.]

Corizon does not argue that Dr. Taylor is not qualified to testify in general. [*See* DN 112.] Based on Dr. Taylor's extensive experience with the EMR selection and implementation process, the Court finds that he is qualified, based on his "knowledge, skill, experience, training, or education," as an expert in the healthcare technology industry. *See* Fed. R. Evid. 702; *First Tennessee Bank*, 268 F.3d at 335 (Finding admissible "expert testimony derived largely from [the expert]'s own practical experiences throughout forty years in the banking industry.").

Corizon argues, however, that Dr. Taylor's

unqualified assertions on the ultimate question of whether Defendants misrepresented qualities and capabilities of the CorrecTek EMR and service, his opinions on legal duties and leadership failures in implementation, and his statements and inferences related to the circumstances of other CorrecTek implementations should be excluded because they will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

[DN 112 at 5.]

With regard to Dr. Taylor's opinions about whether CorrecTek or the individual Defendants actually made any misrepresentations about the software, the Court has some concern. In *Berry v. City of Detroit*, the Sixth Circuit held that an expert opinion can embrace an ultimate issue before the trier of fact, however "the issue embraced must be a factual one." 25 F.3d 1342, 1353 (6th Cir. 1994). In detail, the court explained that, in that case, that

[t]he expert can testify, if a proper foundation is laid, that the discipline in the Detroit Police Department was lax. He also could testify regarding what he believed to be the consequences of lax discipline. He may not testify, however, that the lax discipline policies of the Detroit Police Department indicated that the City was *deliberately indifferent* to the welfare of its citizens.

*Id.* In other words, while an expert can embrace an ultimate factual issue, he cannot embrace an ultimate *legal* one. Here, the term "misrepresentation," in one sense, is factual – did the software

do what Defendants said it could or not? Based on Dr. Taylor's expert knowledge and experience concerning medical records software and its features, his testimony on this issue could be helpful. On the other hand, one element of Corizon's fraud claim under Kentucky law is a "material misrepresentation." *See Progressive Specialty*, 891 F. Supp. at 379. In its motion to exclude, Corizon argues that Dr. Taylor uses the term "misrepresentation" far too expansively and not in accordance with the law such that his testimony in this regard would be "misleading, unhelpful, and inadmissible under Rule 702." [DN 112 at 8.]

In response, Defendants argue that "[i]t is not uncommon for an expert to use such terminology when opining about the industry standard in highly technical fields." [DN 115-1 at 7 (citing cases).] Defendants assert that "[i]n the case at bar, the sale and implementation of EMR is very specialized, contains many industry specific terms unknown to the typical juror, and involves very specific details which would be beyond the comprehension of most persons" and therefore that "a determination of whether certain terms were significant or not would be a topic where expert assistance would be helpful." [*Id.* at 7–8.] Generally speaking, the Court agrees. For instance, one of Corizon's claims is that Defendants misrepresented that the CorrecTek software was "state of the art." Because Dr. Taylor has specialized knowledge in the EMR industry, his opinion on whether the CorrecTek EMR was actually "state of the art" would be helpful to a jury. On the other hand, there is the potential that his use of the term "misrepresentation," which will ultimately be used in jury instructions, could confuse the jury or risk misleading them about the law. *See Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury.").

The Court finds, however, that this concern can be easily addressed by having Dr. Taylor avoid use of the word "misrepresentation" in his testimony. Dr. Taylor is free to testify regarding the features CorrecTek represented its software to have and whether, in his expert opinion, the software actually did have those features. However, the Court agrees that using the term "misrepresentation" could be confusing to the jury given the fact that the Court must instruct the jury about the meaning of that term under the law. Accordingly, Dr. Taylor should confine his opinions about misrepresentations to "false," "untrue," or "misleading" statements or, more generally, "misstatements." Additionally, the Court will include in the jury instruction about misrepresentation a statement that, regardless of their understanding of that term, the Court's definition controls and is the only one the jurors may apply. Accordingly, the Court will not exclude Dr. Taylor's testimony in this regard, so long as he tailors it as the Court has instructed.[5]

Next, with regard to Dr. Taylor's opinions regarding the amount of responsibility Corizon had during the implementation, Corizon argues that "Taylor goes beyond describing industry standards or explaining terminology" and "argues without support and contrary to the evidence that Corizon 'controlled customization and configuration of the software' and functioned as the 'project management' for the failed implementation." [DN 112 at 5–6.] Corizon argues that these conclusions are incorrect and that, to the contrary, CorrecTek stated in the Executive Overview PowerPoint that a "CorrecTek Project Manager w[ould] oversee every aspect of implementation." [DN 112 at 6; DN 88-3.] "Yet, Taylor offers his legal conclusion that Corizon was responsible for implementation services." [DN 112 at 6.] The Court disagrees with Corizon's characterization of Dr. Taylor's testimony on this issue as "legal conclusions." On

---

[5] Defendants indicate in their response that "Corizon's own expert, Donald M. Jacobs, freely uses the term 'misrepresentation' throughout his expert report when opining on the actions of the CorrecTek Defendants." [DN 115-1 at 8 n.1.] For instance, among many other opinion, Jacobs states that "CorrecTek misrepresented that its system was state of the art and robust." [DN 115-2 at 25 (Jacobs Report).] The Court's ruling regarding Dr. Taylor's use of the term "misrepresentation" will apply equally to Jacobs' use of that term during his testimony.

page fourteen of his report, Dr. Taylor explains that "Corizon undertook standard project management activities, particularly including managing contact with the IDOC and acting as the primary authority for build and configuration." [DN 112-1 at 15.] Contrary to opining as to any "legal duty," this opinion simply reflects Dr. Taylor's belief that Corizon functioned as a "project manager" due to the responsibilities Corizon took on during the implementation.

Next, Dr. Taylor opines that "Corizon clearly controlled customization and configuration," but explains that what he means by this is that "[r]epeated requests for additional forms and configuration were presented to CorrecTek, which generally accepted such requests." [DN 112-1 at 15.] Finally, his opinion that "Corizon, not CorrecTek, was responsible for supplying th[e] project management" is also not an opinion as to a legal duty, but an opinion about who had this responsibility based on the parties' actions during the implementation. Accordingly, the Court will not exclude this testimony. Certainly, to the extent Corizon alleges that Dr. Taylor's opinions as to which party had which responsibilities are *incorrect*, Corizon is free to challenge those opinions at trial through cross-examination and presentation of contrary evidence. *Daubert*, 509 U.S. at 596.

Finally, Corizon seeks to exclude Dr. Taylor's testimony about Corizon's other, successful implementations of CorrecTek software at different facilities. [DN 112 at 9–10.] As the Court noted above when granting Corizon's motion to exclude Heck's testimony on this topic, the success of CorrecTek software at other Corizon locations is irrelevant to whether the CorrecTek Defendants *in this case* misrepresented the software and the services Corizon would be getting pursuant to the MSA and its Schedules *in this case*. Accordingly, Dr. Taylor's testimony in this regard would not help the jury determine a fact in issue. *See* Fed. R. Civ. P. 702(a). Accordingly, the Court will exclude Dr. Taylor's testimony regarding the past successes

or failures of CorrecTek software at different Corizon locations. Corizon's motion to exclude Dr. Taylor's testimony is therefore granted in part and denied in part.

CONCLUSION

For the reasons discussed herein, **IT IS HEREBY ORDERED** as follows:

(1) Plaintiff's motion for summary judgment, [DN 107], is **DENIED**.

(2) Plaintiff's motion to exclude Steven Heck, [DN 111], is **GRANTED IN PART AND DENIED IN PART.**

(3) Plaintiff's motion to exclude Dr. Richard Taylor, [DN 112], is **GRANTED IN PART AND DENIED IN PART**.

(4) The Court will defer ruling on Defendants' motion for summary judgment, [DN 102], pending further briefing from the parties on the issue of contractual limitation of damages. The Court will discuss this issue in greater detail with the parties during the telephonic conference scheduled for **<u>June 12, 2018 at 9:00 a.m. Central Time.</u>**

**IT IS SO ORDERED.**

Date:

cc:      Counsel